UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-24361-CIV-O'SULLIVAN

JOAN HOSPEDALES

     Plaintiff,

vs.

NANCY A. BERRYHILL[1]
Acting Commissioner of Social Security
Administration,

     Defendant.

--------------------------------------------------/

## ORDER

THIS MATTER is before the Court on the Plaintiff's Motion for Summary

Judgment (DE# 24, 04/23/2017) and the Defendant's Motion for Summary

Judgment (DE# 25, 05/23/2017). The plaintiff seeks reversal of the Social Security

Administration's denial of Supplemental Security Income ("SSI") Benefits. In the

alternative, the plaintiff requests a remand for further administrative proceedings. The

complaint was filed pursuant to the Social Security Act, 42 U.S.C. §405(g) ("Act") and is

properly before the Court for judicial review of a final decision of the Commissioner of

the Social Security Administration ("SSA"). On January 31, 2017, the parties consented

to Magistrate Jurisdiction (DE# 18, 01/31/2017), and this matter was referred to the

undersigned for entry of judgment by Judge Altonaga on February 1, 2017 (DE #20,

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for
Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit.

2/1/17). Having carefully considered the filings and applicable law, the undersigned enters the following Order.

**PROCEDURAL HISTORY**[2]

On March 15, 2012, the plaintiff, Joan Hospedales, filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act and a concurrent application for supplemental security income under Title XVI of the Act. (Tr. 74, 247-56). In these two applications, the plaintiff indicated that her disability began on June 9, 2011. (*Id.*). The applications underwent the initial level of administrative review on August 17, 2012, and they were denied. (Tr. 118-42). The applications were reviewed and considered again after the plaintiff filed a request. The claims were again denied on November 14, 2012. The plaintiff then filed a timely written request for hearing on January 15, 2013. 20 C.F.R. §§404.929 *et seq.* and 416.1429 *et seq*; (Tr. 150-54).

The Administrative Law Judge ("ALJ") held a video hearing on April 1, 2015. 20 C.F.R. §§404.936(c) and 416.1436(c); (Tr. 38-73). An attorney represented the plaintiff in connection with her applications during the hearing and presented evidence on her behalf. (*Id.*). Pursuant to 20 C.F.R. §§404.1560(b)(2), 404.1566(e), 416.960(b)(2), and 416.966(e), the Commissioner engaged a vocational expert (VE). (Tr. 68-72). The VE appeared at the hearing and provided testimony. (*Id.*). The VE "testified that a person with plaintiff's RFC and vocational profile would be capable of performing plaintiff's past

---

[2]All references to "Tr." refer to the transcript of the Social Security Administration record filed on January 30, 2017. (DE# 17, 01/30/2017). The page numbers listed in this document refer to the bold numbers found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers.

relevant work as a nursing aide as that job is generally performed in the national economy."[3] Def.'s Mem. at 3; *see* Tr. 70, 72, 334. The Dictionary of Occupational Titles ("DOT") designates the job of nursing aide, as the job is generally performed in the national economy, as performed at a medium-exertion level. (Tr. 70, 72, 343). The VE also testified that in her opinion, if the DOT were to reevaluate the exertional level of the job of a nurse's aid, the job would be classified as heavy. (Tr. 72).

Following the hearing, the plaintiff amended her alleged onset date of disability to January 1, 2012. (Tr. 12, 343-44). After the hearing, the ALJ left the record open at the plaintiff's request to allow the plaintiff to submit additional evidentiary records.  (Tr. 58). On April 2, 2015, the plaintiff provided additional records from Damian Lue, O.D., and from Taylor/Caplin Breast Health Center. (Tr. 1415-16).

The ALJ found that the plaintiff was disabled from January 1, 2012, through March 19, 2013.  Following the ALJ's findings, the plaintiff timely appealed. (Tr. 5).  The Appeals Council denied the plaintiff's request for review.  (Tr. 1-3).   The plaintiff thereafter filed this action for review of the Commissioner's decision. This case is ripe for judicial review under both 42 U.S.C. §§ 405(g) and 1383(c)(3).

## FACTS

**I.**   **Plaintiff's Background**

At the time of the hearing on April 1, 2015, the plaintiff was sixty-two years (62) old, single, and living with her disabled daughter. (Tr. 45). The plaintiff completed primary school and vocational school. (Tr. 45, 47). In vocational school, the plaintiff

---

[3] RFC stands for residual functional capacity.

learned "typing, bookkeeping, and shorthand." (*Id.*). The plaintiff was a childcare provider until 2002. (Tr. 49). She worked as a child monitor. (Tr. 49). The plaintiff is a Certified Nursing Assistant ("CNA"). (Tr. 49). From 2003-2011, the plaintiff worked at Triad Senior Living ("Triad") as a CNA. (Tr. 48). The plaintiff alleged that she stopped working as a CNA at Triad because she was experiencing problems related to prolapse. (Tr. 50).

## II.    Summary of Medical Evidence

The plaintiff originally alleged that her disability started in June of 2011. (Tr. 46). Following the hearing on April 1, 2015, the plaintiff amended that date to January 1, 2012. (Tr. 57, 343-44). The plaintiff testified that her symptoms from prolapse forced her to stop working by the end of June 2011. (Tr. 48). The plaintiff indicated that in 2011, walking was a problem due to the prolapse because it gave a sensation of the womb and she had urinary leakage. (Tr. 55). At the ALJ hearing, in explaining the lack of early documentation regarding the plaintiff's prolapse, the plaintiff's attorney noted that "once the cancer showed up the prolapse almost non-as if it didn't exist." (Tr. 57).

In January of 2012, the plaintiff was diagnosed with cancer in the left breast. (Tr. 1135). On February 15, 2012, the plaintiff was admitted to the Adult Surgical Ward of Eric Williams Medical Sciences Complex-X-Ray Radiology Department. (Tr. 346) The admitting diagnosis was an "OT: mastectomy and axillary clearance." (*Id.*). The operation was performed, and the plaintiff was discharged on February 17, 2012. (*Id.*). On February 20, 2012, the plaintiff "underwent left modified radical mastectomy," and on February 28, 2012, surgery was performed to remove the cancer from her left

breast. (Tr. 58, 1135). Beginning June 8, 2012, the plaintiff underwent two cycles of chemotherapy. (Tr. 1135). In September 2012, the plaintiff received endocrine therapy with Femara, and the therapy continued through June 1, 2014. (Tr. 1147, 1213). Clinic notes dated September 7, 2012, show that the plaintiff experienced no acute distress, and had a point score of zero, an affect that was appropriate, and a gait and coordination that were within normal limits. (Tr. 1248).

Clinic notes dated September 26, 2012, indicate that the plaintiff reported that she was feeling well overall and that she denied any other complaints. (Tr. 1237). The same clinic notes also indicate that the plaintiff was not under any acute distress, was negative for gastrointestinal issues, and was negative for neurologic issues. (Tr. 1238). From November 26, 2012, through January 11, 2013, the plaintiff completed radiation treatment. (Tr. 1147, 1213). Clinic notes dated March 20, 2013, indicate that since completing radiation, the plaintiff was doing well and felt better. (Tr. 1213).

Clinic notes dated June 7, 2013, represent that there was not acute distress in the plaintiff's general appearance. (Tr. 1206). In this same evaluation, the plaintiff's pain score was zero. (*Id.*). The notes also indicated that the plaintiff's neurologic evaluation represented that the plaintiff's affect was appropriate, and that her gait and coordination were within normal limits. (*Id.*). The same observations about the plaintiff's appearance and gait were made on both June 29, 2012, and July 20, 2012. (Tr. 1284, 1292). On May 8, 2012, the plaintiff had a consultation with Doctor Judith Hurley at Jackson Health System. (Tr. 1318). The notes indicate that the plaintiff tested negative for

dysuria[4], urinary frequency or hesitancy, and hematuria.[5] (*Id.*). The plaintiff was also negative for pain, stiffness, swelling, and joint limitation. (*Id.*). The plaintiff also did not have "palpable cervical, supraclavicular, axillar, or inguinal lymph nodes." (*Id.*). The plaintiff did not show any signs of distress and had a pain score of zero. (*Id.*). The plaintiff had an affect that was appropriate, and her gait and coordination were both normal. (Tr. 1319). On March 20, 2013, the plaintiff had "clinically improved from acute radiation dermatitis" and there was "no evidence of . . . other side effects." (Tr. 1214). Twenty-one months later, on December 30, 2014, Jackson Health System clinic notes indicated that the plaintiff had done well after multimodality of treatment, did not have any breast complaints, and her breast exam was stable. (Tr. 1138).

On October 4, 2013, a gynecological ultrasound showed a prolapse of the plaintiff's uterus. (Tr. 1188). On October 22, 2013, the plaintiff was diagnosed with uterovaginal prolapse. (Tr. 1184). On January 27, 2014, the plaintiff indicated that the prolapse caused her to have the "feeling [of] something hanging out of her vagina," and a "pressure like sensation [that was] bothersome in clothing." (Tr. 1179). In December 2014 the plaintiff underwent a vaginal hysterectomy. (Tr. 1101). The surgery was successful. (Tr. 1098-1133).

Clinic notes dated June 1, 2014, for which Judith Hurley was listed as the attending provider, noted that the plaintiff was "on continued surveillance with no

---

[4] "Dysuria is the medical term for pain or discomfort when urinating." *"Dysuria."* Drugs.com, https://www.drugs.com/health-guide/dysuria.html (last visited on Aug. 8, 2017).

[5] Hematuria is "the presence of blood in urine." "Hematuria." Google.com, https://www.google.com/search?q=hematuria&oq=hematuria&aqs=chrome..69i57j69i60j0l4.2056j0j4&sourceid=chrome&ie=UTF-8 (last visited on Aug. 8, 2017).

evidence of disease." (Tr. 1147). The same clinic notes indicated that the plaintiff had a "followup appointment with Urology due to complaints of uterine prolapse." (Tr. 1148). On March 20, 2014, a gynecological ultrasound was performed, and "showed retroverted uterus with endometrium." (*Id.*). The right ovary was normal, and the left ovary contained a "clear cyst." (*Id.*). On June 9, 2014, the plaintiff had a urine culture performed, and gall stones were found in the plaintiff's bladder. (Tr. 1141).

On March 24, 2015, the Breast Cancer Institute at Jackson Memorial Hospital notified the plaintiff that the results of her March 23, 2015, mammogram required that she return to Jackson Memorial Hospital for a "full workup." (Tr. 42, 1417).

On August 13, 2012, Walter Harris, M.D., in a Disability Determination Explanation, opined that the plaintiff had exertional limitations. Specifically, the plaintiff was able to: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand or walk about 6 hours in an 8-hour day; (4) sit about 6 hours in an 8-hour day; and (5) push and/or pull an unlimited amount. (Tr. 79). On October 11, 2012, Gloria Hankins, M.D., in a Disability Determination Explanation, opined that the plaintiff's exertional limitations were the same as outlined by Dr. Harris in August 2012. (Tr. 100).

III.     **The Administrative Hearing**

A.     **Plaintiff's Testimony**

At the time of the ALJ hearing, the plaintiff was sixty-two years old. (Tr. 45). The plaintiff was single and living with her daughter, which is the only person the plaintiff takes care of or supports. (Tr. 45, 47). The daughter does not work because she has

epilepsy. (Tr. 45-46). The plaintiff mainly supervises her daughter when the daughter showers, in case the daughter has a seizure while showering. (Tr. 46, 65). The plaintiff indicated that her height and weight at the time of the hearing was about 5'7" and about 178 pounds. (Tr. 47). The plaintiff noted that she completed primary school and vocational school for typing, bookkeeping, and shorthand, and that she does not have a high school equivalency diploma. (*Id.*).The plaintiff testified that she receives financial help from two churches that she attends. (Tr. 47-48). The plaintiff stated that she had not done any odd jobs for cash in the four years prior to the hearing date and that she was not working at the time of the hearing. (Tr. 48). The plaintiff indicated that her last date of work was in June of 2011. (*Id.*) At that time, the plaintiff was working as a CNA at Triad. (*Id.*). The plaintiff stated that she worked at Triad from 2003-2011until symptoms of prolapse[6] caused her to move too slowly and end her employment. (*Id.*). As noted by the plaintiff's attorney at the ALJ hearing, once the plaintiff was diagnosed with cancer, the prolapse became secondary. (Tr. 57). The plaintiff indicated that some of her self-employment income came from being a CNA. (*Id.*). The plaintiff also alleged to have worked as a CNA at a "very heavy level." (Tr. 49).

The plaintiff testified that she is able to take care of her own grooming and personal hygiene, with the exception that she cannot lift her left hand too high to comb her hair. (Tr. 51). The plaintiff is right-handed and can comb her hair using her right

---

[6] The plaintiff attributes her employment termination to symptoms of prolapse; however, the ALJ noted that the plaintiff first sought medical treatment for prolapse in January of 2014. (Tr. 61). After a request by the ALJ for the plaintiff to provide medical records documenting her prolapse between the time of the alleged onset of June 2011 to January 2014, (Tr. 56), the plaintiff provided documentation of an October 22, 2013 prolapse diagnosis. (Tr. 1184).

hand. (*Id.*). The plaintiff indicated that she must use both hands to stretch and grab something, such as coffee creamer. (Tr. 66). The plaintiff stated that it is very strenuous for her to unscrew things such as water bottles, and that she is only able to do so with her right hand. (Tr. 67). The plaintiff further stated that she could only lift a gallon of milk with her right hand, not her left. (*Id.*).

The plaintiff indicated that she does light housework, including vacuuming, but not sweeping or mopping. (Tr. 52). The plaintiff also indicated that she does laundry and washes dishes and that sometimes her daughter's friends come over and offer help with housework. (*Id.*). For socializing, the plaintiff attends church and has breakfast with her church friends. (*Id.*). The plaintiff has never had a driver's license. (Tr. 52-53). For transportation, the plaintiff uses a company called SDS, which is provided for by the county. A friend also drives the plaintiff to and from the store about once a month. (*Id.*).

The plaintiff alleged that she is unable to work because of strain and that sometimes she has a lot of weakness and falls. (Tr. 54). The plaintiff indicated that she is unaware of why she falls, but sometimes she falls on the street and that she does not feel safe anymore as a result. (*Id.*). The last time the plaintiff fell prior to the hearing was on February 17, 2015, and prior to that she fell in December 2014. (*Id.*). The plaintiff claimed that she did not require medical care after either of the falls. (*Id.*). The plaintiff explained that sometimes she feels as if she can barely walk and that sometimes she has to rock in order to rise from a chair. (*Id.*). The plaintiff said she is able to lift five pounds using her left hand and ten pounds using her right hand. (Tr. 55). The plaintiff claimed that she has limitations regarding the duration she can stand or

walk. (*Id.*). The plaintiff indicated that doctors encourage her to build her strength and that sometimes she walks a mile and must stop. (*Id.*). The plaintiff indicated that in 2011 the prolapse affected her ability to walk because it gave her a "sensation to the womb" and would cause her to leak urine, requiring her to wear a pad. (Id.). The plaintiff stated that she wore protective undergarments on a daily basis. (Tr. 56).

The plaintiff noted that when she was diagnosed with cancer, she did not attend to her prolapse issues in order to attend to her cancer. (*Id.*). In May of 2014, the plaintiff was cleared for surgery for the prolapse, which was first reported to Dr. Jorge Garcia on January 27, 2014. (Tr. 61, 1179). The plaintiff stated that while she healed from chemotherapy treatment until the beginning of 2014, she was not able to work due to bloodwork, bone testing, and heart testing, but these work interruptions were resolved after the plaintiff's prolapse surgery in December of 2014. (Tr. 61-62). The plaintiff did not go back to work after that because of regular checkups in Trinidad, one of which was on August 4, 2014, to check on some continuing bleeding issues. (*Id.*).

The plaintiff testified that she tried to go back to work for about one month in January of 2014 and that she was unable to do so. (Tr. 62-63).  The plaintiff testified that she was working for a private person and was being paid cash. (*Id.*). The plaintiff indicated that a friend referred her to the job, and the plaintiff thought the job was going to be "light." (*Id.*). The plaintiff further indicated that she stopped the job because she did not feel well. (*Id.*).

The plaintiff stated that she experienced urine leakage. (Tr. 63-64).  The plaintiff explained that when her bladder was tested the results showed that there was a little

leakage, requiring her to wear pads during the day and night. (Tr. 64). The plaintiff

noted that the leakage was greater before the prolapse surgery. (Tr. 66). The plaintiff

indicated that before she had the surgery she had to wear large maternity pants

because she urinated when she walked and also when she stood up to begin walking.

(*Id.*). The plaintiff indicated that at the time of the hearing she still had leakage issues

requiring her to wear pads. (*Id.*) At the time of the hearing, the plaintiff was taking

hydrocodone[7] for lower back pain about twice a week, Glyburide[8] and Metformin[9] for

diabetes, and Nifedipine[10] for high blood pressure. (Tr. 64, 65).

###   B.   Vocational Expert (VE) Testimony

A VE testified at the ALJ hearing. (Tr. 68-72).  The VE was asked hypothetical

questions and to presume that the hypotheticals referred to "an individual of the

Claimant's age, education, and work history." (Tr. 69-70). The ALJ asked whether such

an individual "would be capable of performing any of the Claimant's past work or any

other work." (Tr. 70). The ALJ also took "judicial notice of the applicable grid rules given

---

[7] "Hydrocodone is an opioid pain medication." "Hydrocodone." Drugs.com, https://www.drugs.com/hydrocodone.html (last visited Aug. 8, 2017).

[8] "Glyburide is an oral diabetes medicine that helps control blood sugar levels. Glyburide is used to treat type 2 diabetes. This medicine is not for treating type 1 diabetes." "Glyburide." Drugs.com, https://www.drugs.com/glyburide.html (last visited Aug. 8, 2017).

[9] "Metformin is an oral diabetes medicine that helps control blood sugar levels. Metformin is used to improve blood sugar control in people with type 2 diabetes." "Metformin." Drugs.com, https://www.drugs.com/metformin.html (last visited Aug. 8, 2017).

[10] "Nifedipine is in a group of drugs called calcium channel blockers. It works by relaxing the muscles of your heart and blood vessels. Nifedipine is used to treat hypertension (high blood pressure) and angina (chest pain)." "Nifedipine." Drugs.com, https://www.drugs.com/nifedipine.html (last visited Aug. 8, 2017).

. . . if the Claimant were limited and unable to perform her past work," and the ALJ noted that the claimant in this case has "been over the age of 55 at all times during the pendency of this case." (*Id.*). The first hypothetical asked:

> consistent with the DDS, opinions of Dr. Harris and Dr. Hankins, please assume a limitation to medium exertional work, however the individual would have additional limitations that I will describe and should never climb ladders, ropes, or scaffolds, overhead reaching with the left non-dominant extremity would be limited to occasional. Given those limitations, would such an individual be able to perform any of the Claimant's past work or any other work?

(*Id.*). The VE responded, "I would say yes to past work and there would be other medium, unskilled work that could be performed." (*Id.*). The ALJ then asked whether the VE was referring to "past work as generally performed and the child monitor job also as actually performed," to which the VE answered, "Right. The physical demand as the nurse's aid was performed would be no." (*Id.*). The second hypothetical added the following: "[A] limitation to light exertional work would preclude the performance of past work. Is that right?" The VE responded, "Yes." (Tr. 71).

The third hypothetical entailed the same limitations as hypothetical one, but the ALJ also included the following: what if "the individual were off-task at least 20% of the workday due to the effects of surgery and chemotherapy . . . the individual would not be able to perform any of he past work. Is that correct?" (*Id.*). The VE answered, "That is correct." (Tr. 71). The ALJ then asked about such an individual's ability to do any other work. (*Id.*). The VE indicated that there would not be any other work available if the "20% were on a consistent basis." (*Id.*).The ALJ then asked the VE if her testimony was consistent with the DOT. (*Id.*). The VE answered, "I would say yes, however the DOT

does not cover the off-task and that would be based upon my professional experience and research." (*Id.*).

The plaintiff's attorney asked the VE whether the "CNA job is listed as medium under the DOT." (Tr. 72). The VE responded that a CNA job is listed as medium. (*Id.*). The plaintiff's attorney then asked the VE whether from her personal experience, she agrees that CNA work is typically performed at a medium level or if it would be performed at a higher level. (*Id.*). The VE responded that in her

> professional experience and personal experience, I also worked as a CNA, it would be if not heavy to very heavy. I think that it does describe it as medium, but obviously the DOT has not been updated in several years and if they were to update it with this job title, in my opinion, I would say it would be at a higher physical demand than what it currently is stated to be.

(*Id.*).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . ." 42 U.S.C. §§ 416(I) (2004) ; 423(d)(1) (2004); 20 C.F.R. § 404.1505 (2012). The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . ."(42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 (2012).

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. §§ 404.1520(a)-(f). The ALJ must first determine

whether the plaintiff is presently employed. If so, a finding of non-disability is made and the inquiry ends.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made and the inquiry ends.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(d), Subpart P, Appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the plaintiff's ability to perform other work. *Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. "Residual functional capacity" is defined as "what you can do despite your limitations." 20 C.F.R § 404.1545(a)(1). This determination takes into account all relevant evidence, including medical evidence, the plaintiff's own testimony, and the observations of others. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e); *See Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991) (holding

that the claimant bears the initial burden of proving that he is unable to perform previous work).

Fifth, the ALJ must decide, if the plaintiff cannot perform his or her past relevant work, if he or she is capable of performing any other work in the national economy.

## THE ALJ'S FINDINGS

At step one, the ALJ found that "[t]he claimant meets the insured status requirements of the Social Security Act through June 30, 2013." (Tr. 17). At step two, the ALJ found that "[t]he claimant has not engaged in substantial gainful activity since January 1, 2012, the date the claimant became disabled." 20 C.F.R. §§404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*; (*Id.*). At step three, the ALJ found that the plaintiff had the severe impairment of breast cancer from January 1, 2012, through March 19, 2013. (Tr. 18). At step four, the ALJ found that, "[f]rom January 1, 2012, through March 19, 2013, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 20). At the fifth step, the ALJ found that the plaintiff had the RFC to do medium level work. (Tr. 21).

## STANDARD OF REVIEW

The Court must determine if it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g)

(2006); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute its discretion). On judicial review, decisions made by the defendant, the Commissioner of Social Security, are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); *Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). Substantial evidence is more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Substantial evidence is relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion. *Richardson*, 402 U.S. at 401. In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("[Commissioner]'s failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide facts anew, re-weigh evidence, or substitute its

judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. *Id*.

## LEGAL ANALYSIS

The plaintiff argues that: (1) "the vocational expert testified there was no work a hypothetical individual such as the plaintiff could perform;" (2) "the ALJ violated SSR 00-04p by failing to resolve the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles;" and (3) "the substantial evidence does not support the residual functional capacity established by the ALJ." Pl.'s Mem. at 6, 8, and 10 (DE# 24, 04/23/2017).

I. **THE ALJ FOUND THAT, BEGINNING MARCH 20, 2013, THE PLAINTIFF WAS CAPABLE OF PERFORMING HER PAST RELEVANT WORK AS A NURSING AIDE, AND THE ALJ FAILED TO PROPERLY RECOGNIZE THE TESTIMONY OF THE VE REGARDING HOW THE DOT WOULD CLASSIFY A NURSE'S AID IF THE DOT WOULD REEVALUATE**

A. **The VE's Testimony**

The ALJ found that, as of March 20, 2013, the plaintiff is not disabled, and, as a result, the undersigned finds that the ALJ opined that the plaintiff can perform past relevant work as a nurse's aid as the job is generally performed in the national economy. (Tr. 30, 69).

The VE gave an opinion as to what the DOT (*DOT-IV* § 355.674-014) would say

about the exertional level of a nurse's aid if an update occurred (Tr. 30, 69; Pl.'s Mem. at 6).  The VE noted that the plaintiff could perform past relevant work as it is performed in the general economy, which the DOT describes as medium. (Tr. 69-71); *DOT-IV* § 355.674-014. The VE opined, however, that the DOT would classify a nurse's aid job as a heavy exertion job, after an update. (Tr. 71).

The ALJ based her decision to deny the plaintiff's benefits on the VE's testimony that the plaintiff's job as nurse's aide was of a medium exertional level. (Tr. 30, 69). The ALJ concluded that the plaintiff is capable of returning to her past relevant work as nurse's aid. (Tr. 30). The plaintiff asserts that, "when the vocational expert was questioned, [the VE] stated that [the VE] disagrees with the DOT." (Tr. 72). The plaintiff also alleges that, "when asked to explain, the vocational expert stated that the DOT has not been updated for many years," and that the VE "felt that if it was updated it would be more accurate and show that nurse's aid required at least a heavy exertional demand." (Tr. 72); Pl.'s Mem. at 6.

The record supports the plaintiff's assertions. The VE noted that "the DOT has not been updated in several years and if they were to update it with [the job title of nurse aid]," the DOT would classify a nurse's aid at a higher physical demand. (Tr. 72). The VE opined it would be possible for an individual who is limited to doing medium exertional work, among other limitations, to perform past work and other medium, unskilled work.

In the VE's opinion, however, the plaintiff is unable to perform the physical demands of her previous work as a nurse's aid. (Tr. 70-72).  The VE indicated that her

testimony was consistent with the DOT, but that the DOT does not cover anything off-task. (Tr. 71). The plaintiff asserts that the "ALJ held that the Plaintiff was limited at most to medium exertional demands." Pl.'s Mem. at 6. The plaintiff indicates that "the job of nurse's aid requiring heavy to very heavy exertional demands makes it impossible for the Plaintiff to perform." Pl.'s Mem. at 6. The VE's testimony that a nurse's aid, the past relevant work of the plaintiff, would be classified as "heavy to very heavy" if the DOT were to make updates to the description, further supports the plaintiff's assertion. (Tr. 72).

The plaintiff's medical history shows that, on August 13, 2012, Walter Harris, M.D., in a Disability Determination Explanation, opined that the plaintiff had some exertional limitations and was able to: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand or walk about 6 hours in an 8-hour day; (4) sit about 6 hours in an 8-hour day; and (5) push and/or pull an unlimited amount. (Tr. 79). On October 11, 2012, Gloria Hankins, M.D., in a Disability Determination Explanation, opined that the plaintiff's exertional limitations were the same as outlined by Dr. Harris in August 2012. (Tr. 100). The plaintiff's exertional limitations preclude the plaintiff from performing a heavy exertion job.

The DOT labels the job of nurse's aid as one requiring medium exertion. (Tr. 69, 71). However, the VE indicated that if the exertion level of a nurse's aid was reevaluated, the exertion level would be classified as heavy. Two Past Relevant Work Summaries were completed by vocational experts regarding the plaintiff's ability to work as a nurse's aid. (Tr. 69, 332, 334). The VE testified consistently with these summaries, indicating that an individual like the plaintiff can perform past work and

other medium, unskilled work. (Tr. 70). However, according to the VE, a nurse's aid

would be classified as heavy, not medium, if the DOT revamped the exertional levels.

(Tr. 72). Because the plaintiff is unable to perform her past relevant work, the

undersigned remands this matter for the ALJ to determine at Step 5 if the plaintiff is

capable of performing any other work in the national economy.

**B.     The ALJ Violated SSR 00-04p Because There Was a Conflict Between
the Vocational Expert's Testimony and the Dictionary of
Occupational Titles**

SS 00-4p requires that the ALJ ask the VE if the VE's testimony is consistent

with the DOT. See SSR 00-4p; 65 Fed. Reg. 75, 759-01, 75, 760 (Dec. 4, 2000); Def's

Mem. at 8. SS 00-

4p  provides that

> [A]djudicators must:
> •      Identify and obtain a reasonable explanation for any conflicts between
>        occupational evidence provided by VEs . . . and information in the
>        [DOT], including its companion publication, the Selected
>        Characteristics of Occupations Defined in the Revised Dictionary of
>        occupational Titles (SCO), published by the Department of Labor, and
> •      Explain in the determination or decision how any conflict that has
>        been identified was resolved.

SSR 00-4p (Dec. 4, 2000).

> [T]he adjudicator has an affirmative responsibility to ask about any possible
> conflict between that VE . . . evidence and information provided in the DOT.
> In these situations, the adjudicator will:
> •      Ask the VE . . . if the evidence he or she has provided conflicts with
>        information provided in the DOT; and
> •      If the VE's . . . evidence appears to conflict with the DOT, the
>        adjudicator will obtain a reasonable explanation for the apparent
>        conflict.

SSR 00-4p, (Dec. 4, 2000).

As alleged by the plaintiff, the VE did "specifically state[] that in her opinion the DOT is wrong." Pl.'s Mem. at 13. The ALJ asked the VE whether the VE's testimony at the hearing was consistent with the DOT. (Tr. 71). The VE responded, "I would say yes, however the DOT does not cover the off-task and that would be based upon my professional experience and research." (Tr. 71).

The VE testified that, based on her personal experience having worked as a CNA, the job of a CNA is heavy to very heavy. (Tr. 72). The VE stated that the DOT describes work as a CNA as medium, but that the DOT had not been updated for several years and, if it were to be updated, the VE believed a CNA would have a higher exertional level listed. (Tr. 72). The VE offered an opinion as to how she thought the DOT may describe a CNA job if the DOT was updated.

The undersigned finds that the ALJ violated SSR 00-04p, because of the conflict between the VE's testimony and the DOT. Accordingly, the undersigned remands this matter for the ALJ to obtain a reasonable explanation for the apparent conflict and explain how this conflict was resolved.

## II. THE ALJ DID NOT PROPERLY ACCOUNT FOR THE PLAINTIFF'S UTEROVAGINAL PROLAPSE IN ASSESSING THE PLAINTIFF'S RFC BEGINNING MARCH 20, 2013 AND SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE RFC ESTABLISHED BY THE ALJ

The evidence in this matter does not support the RFC established by the ALJ in this case. "[T]he mere existence of [a condition] does not reveal the extent to which [the condition]" limits the claimant's "ability to work or undermine the ALJ's determination in that regard."). *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). "[T]he 'severity' of a medically ascertained [impairment] must be measured in

terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). "The mere diagnosis [of a condition], of course, says nothing about the severity of the condition."). *Id.* Even if a claimant has an impairment that an ALJ decides is severe, the fact that the claimant has a severe impairment does not determine to what extent the impairment limits a claimant's ability to work, or whether it does at all. *See Moore v. Barnhart*, 405 F.3d at 1208. The claimant bears the burden, through steps one through four of the analysis, of proving the existence and severity of limitations caused by her impairments and that she is precluded from performing her past relevant work. *Menendez v. Colvin*, 12-21505-CIV, 2015 WL 1311460, at *2 (S.D. Fla. Mar. 23, 2015); see *Hale v. Bowen*, 831 F.2d 1007, 1001, 1007 (11th Cir. 1987).

The plaintiff asserts that "[t]he substantial evidence of record does not establish or support an [RFC] as established by the ALJ." Pl.'s Mem. at 10. The plaintiff provides that, "[a]fter establishing an [RFC] for the claimant the ALJ then found an additional severe impairment." Pl.'s Mem. at 10; (Tr. 25). The plaintiff alleges that "whatever the effect is [of the uterovaginal prolapse] must be included in the hypothetical to the vocational expert and must be included in the ALJ'S [RFC]." Pl.'s Mem. at 11.

The ALJ found that the uterovaginal prolapse is an additional physical impairment. (Tr. 25). The plaintiff asserts that "[i]t is impossible to have a severe impairment without any effect on the residual functional capacity." (*Id.*).[11] The plaintiff stated that her symptoms of prolapse prevented her from working as a CNA in June

---

[11] In the body of her opinion, the ALJ indicated that the prolapse was an additional physical impairment. (Tr. 25).

2011. (Tr. 48). At the ALJ hearing, the plaintiff's attorney explained that after the plaintiff's cancer diagnosis, the prolapse issue became secondary. (Tr. 57). The plaintiff's medical documents indicate that she was officially diagnosed with uterovaginal prolapse on October 22, 2013. (Tr. 1184). However, medical records indicate that the plaintiff complained of prolapse symptoms a year prior to this diagnosis. (Tr. 1179). The plaintiff received medical treatment for her prolapse beginning in January 2014. (Tr. 61 & 1179).

After January 2014, the next description of the effects of the uterovaginal prolapse in the record is found in the transcript of the April 1, 2015, hearing. (Tr. 26, 66). During the hearing, the plaintiff asserted that the uterovaginal prolapse was causing her pain and weakness. (Tr. 54). The plaintiff explained that, because of the weakness, she fell twice, once in December of 2014 and once on February 17, 2015. (*Id.*). In addition, the plaintiff asserted that the uterovaginal prolapse affected her ability to walk, and explained that sometimes standing up from a chair was difficult. (Tr. 54). In addition to the weakness, the plaintiff asserted that the uterovaginal prolapse was causing her to experience urinary leakage. (Tr. 66). The ALJ failed to indicate whether the prolapse was accounted for in the ALJ's RFC. Accordingly, a remand is appropriate for the ALJ to make a determination regarding the disabling nature of the plaintiff's prolapse.

## CONCLUSION

Accordingly, it is

ORDERED AND ADJUDGED that the Defendant's Motion for Summary

Judgment (DE# 25, 05/23/2017) is DENIED, the Plaintiff's Motion for Summary

Judgment (DE# 24, 04/23/2017) is GRANTED, and this case is REMANDED to the ALJ

for the reasons stated herein.

DONE AND ORDERED at the United States Courthouse, Miami, Florida, this 7th

day of December, 2017.

_____
JUDGE JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE

Copies provided to:
All counsel of Record